STATE ex rel. UNITED STATES v. DISTRICT COURT OF SEVENTEENTH JUDICIAL DISTRICT and Another.[1]

April 23, 1909.

Nos. 16,074—(273).[2]

**Naturalization of Alien—Evidence.**

While great caution should be exercised in the examination of applicants for citizenship, yet no hard and fast rule can be laid down. Each case must depend largely upon its special facts. The practical test is whether the evidence, considered as a whole, justifies the conclusion that the applicant will make a good citizen. An applicant, otherwise entitled to citizenship, should not necessarily be denied the right because the evidence shows that he has no accurate knowledge of the federal constitution and form of government.

At an examination of aliens desiring to obtain citizenship papers held before the district court for Jackson county, the assistant United States attorney made a motion that such papers be denied Marius Hansen, one of the applicants, because of unsatisfactory answers made by him and that he could not adequately understand the oath of allegiance or comprehend its meaning. The motion was denied, Quinn, J., and Hansen was admitted to citizenship. Thereupon the United States procured from this court a writ of certiorari. Affirmed.

[1] Reported in 120 N. W. 898.          [2] October, 1908, term calendar.

*John C. Sweet,* Assistant United States Attorney, for relator.

Naturalization is now regulated by 34 U. S. St. at Large, c. 3592, pt. 1, 596, (Act June 29, 1906); also found in 1907 Supp. U. S. Comp. St. 1901, 419, et seq. Neither this law nor any previous naturalization law provided for an appeal either by the government or by the petitioner. There is no direct appeal from a final order in such a proceeding. It is not a proceeding at common law; it is not a civil action; nor is it a special proceeding, so that any provisions of the Minnesota statute for a direct appeal would be applicable. It is not strictly speaking a proceeding of the district court of the state of Minnesota, as such, but it is a proceeding which the court may take cognizance of, (but is not obliged to do so) under the federal law and as an agency of the federal government. All state courts, "in hearing and determining applications for naturalization are exclusively under the laws of the United States and should be deemed quoad hoc courts of the United States." Holcomb, Naturalization, 21; In re Christern, 43 N. Y. Super. 523 (1878); Petersen v. State, 40 Tex. Civ. App. 175; Van Dyne, Citizenship, 64.

Under the constitution of the United States congress has exclusive jurisdiction over the subject of naturalization. Dred Scott v. Sandford, 19 How. 393; U. S. v. Wong Kim Ark, 169 U. S. 649; City of Minneapolis v. Reum, 56 Fed. 576; Van Dyne, Naturalization, 6–9. No provision of the federal statute which requires the courts or judges of the state to perform any of the duties respecting the admission of aliens to citizenship is obligatory; they may if they choose exercise the power conferred upon them by congress unless prohibited by state legislation, but this is a naked power and imposes no duty respecting the naturalization of aliens. Gilroy, Petitioner, 88 Me. 199; Holcomb, Naturalization, 29.

The powers conferred on courts to naturalize are judicial, not ministerial. In re Clark, 18 Barb. 444; Van Dyne, Naturalization, 9, and cases cited; State v. MacDonald, 24 Minn. 48; Holcomb, Naturalization, 25.

The United States may institute certiorari proceedings as the party injured by the illegal admission of an alien to citizenship. Section 11 of the naturalization act above cited specifically authorizes the United States to appear before any court exercising naturalization

jurisdiction for the purpose of cross-examining the petitioner and the witnesses, and may call witnesses, produce evidence, and be heard in opposition to the granting of a petition. Section 4 requires the petitioner to file his petition in duplicate. Section 6 provides that the petition shall remain on file for at least ninety days, and be heard only on a regular day fixed by rule of court. Section 12 requires the clerk of the court to transmit to the Bureau of Immigration and Naturalization at Washington duplicates of all petitions within thirty days after the filing of the same. Section 10 provides for depositions in certain cases upon notice to the Bureau at Washington and the United States Attorney in the district where the witnesses reside. Section 15 provides that the United States in certain cases shall have the right to institute proceedings for the cancellation of certificates obtained either fraudulently or illegally. It is the letter and spirit of the entire statute that the United States is a party interested in seeing that the federal laws concerning naturalization are properly administered and construed by the state courts which assume jurisdiction.

START, C. J.

Certiorari to review the judgment of the district court of the county of Jackson admitting Marius Hansen, hereinafter referred to as the petitioner, an alien, as a citizen of the United States of America. The jurisdiction of state courts to hear and determine applications for citizenship under the naturalization laws of the United States is not here questioned by either party, and we assume that state courts have such jurisdiction, and that certiorari will lie on the petition of either party to review a final judgment in such a case. The petition in this case and all proceedings therein complied with the law in form and substance. The only question, then, for our consideration is whether the evidence sustains the finding and judgment of the trial court.

The contention of the relator, reduced to its lowest terms, is that the evidence is wholly insufficient to support the necessary finding that the petitioner is attached to the principles of the constitution of the United States and well disposed to the good order and happiness of the same. Whether or not the evidence is sufficient depends upon the point of view it is considered; that is, whether in a practical or a scholastic way.

The adjudged cases, as to the character of the evidence necessary to be produced to establish that an applicant for citizenship is "attached to the principles of the constitution of the United States and well disposed to the good order and happiness of the same," are in conflict. One class of cases takes a severely logical view of the question, and holds that a person cannot be attached to the principles of the constitution and intelligently make oath to support it unless he has some general knowledge of what the constitution is and the principles which it affirms; hence the essential evidence of his attachment to the constitution is his knowledge of what it is and the principles which it affirms. In re Bodek (C. C.) 63 Fed. 813; In re Kanaka Nian, 6 Utah, 259, 21 Pac. 993, 4 L. R. A. 726. Another class takes a more practical and juster view of the question, and holds that such knowledge of the constitution and laws of the United States by the applicant is not necessarily the only sufficient evidence of his attachment to the principles thereof; but that evidence that he has behaved as a man should behave who is attached to the principles of the constitution is sufficient, if satisfactory to the trial judge, to support in this respect a judgment admitting him to citizenship. In re Rodriguez (D. C.) 81 Fed. 337; Ex parte Johnson, 79 Miss. 637, 31 South. 208, 89 Am. St. 665.

The naturalization laws do not require any educational qualification, except that the applicant must be able to speak the English language and sign his petition in his own handwriting. Nevertheless he must make it appear, to the satisfaction of the court admitting him to citizenship, that for five years immediately preceding the date of his application "he has behaved as a man of good moral character, attached to the principles of the constitution of the United States, and well disposed to the good order and happiness of the same." Now, if there must necessarily be evidence that the applicant possesses some accurate knowledge of the constitution and our form of government in order to establish his attachment to the principles of the constitution, it would logically follow that, to establish the fact that he has behaved as a man of good moral character and as a law-abiding man, he must give evidence that he possesses some knowledge of the science of human duty and of jurisprudence.

We are of the opinion, upon principle and authority, that while great caution should be exercised in the examination of applicants for citizenship, yet no hard and fast rule can be laid down, for each case must depend largely upon its special facts; that the practical test is whether the evidence, considered as a whole, justifies the conclusion that the applicant will make a good citizen; and, further, that an applicant, otherwise entitled to naturalization, should not necessarily be denied the right because the evidence shows that he has no accurate knowledge of the federal constitution and form of government. The sufficiency of the evidence to support the judgment in this case must be tested by the rule we have stated.

The evidence shows that the petitioner understands that our country is a republic, but tends to show that he has very little accurate knowledge of what the constitution of the United States is or of the principles which it affirms. In other respects the evidence unerringly shows that he possesses all the qualifications of a good citizen. It shows that he is forty six years of age, and was born in Norway, a country that has made large and valuable contributions to the citizenship of our state; that he has given "hostages to fortune," for he has a wife and four children, and he sends his children, who were all born in this country, to the public schools; that he came to this country twenty four years ago, and settled in Minnesota eighteen years ago, where he has followed exclusively the occupation of a farmer, and now successfully operates a rented farm of six hundred forty acres, two hundred acres of which he cultivates, and the balance is used for the stock, which consists of twelve horses and fifty head of cattle, one half of which he owns; that he speaks English fairly well, and writes; that he takes a local newspaper, which he reads occasionally; and, further, that he is and has been at all times a sober, industrious, honest, law-abiding man, possessing the respect and confidence of his neighbors. Surely such a man behaves as a man of good moral character, attached to the principles of the constitution of the United States, and well disposed to the good order and happiness of the same, and will make a good citizen.

Upon the whole evidence we are clearly of the opinion that it supports the judgment of the trial court, and that it should be affirmed.

So ordered.

ELLIOTT, J. (dissenting).

The opinion of the court is unsatisfactory to me because of what it omits, rather than of what it states. I have no quarrel with the doctrines and principles stated, but I feel that the decision is a step backward. The time has gone by when naturalization papers should be granted for the asking. Recent legislation by congress has manifested an intent that the rights and privileges of citizenship should be more carefully guarded in the future than they have been in the past. If the state courts are to exercise this jurisdiction, a jurisdiction which I do not believe can constitutionally be conferred upon them by congress, it should be exercised in the spirit in which the national legislation has been enacted. The naturalization laws require more than a good character and a desire to become a citizen. They require a certain amount of intelligence and information of matters which relate to the duties of citizens. That a man has raised a large family and maintained a good reputation is not sufficient. This applicant has lived in Minnesota for twenty four years, and can continue to live here the rest of his life, under the protection of the laws and entitled to most of the rights and privileges of a citizen. To deny him his application deprives him of no right.

With citizenship goes certain political privileges, and it does not seem unreasonable to require some slight knowledge of the simplest and most elementary principles upon which the government is based. To hold that a man who believes that Washington is president, that Minneapolis or Duluth is the capital of the state, and that the laws are made by the Governor, is entitled to citizenship, would seem to me absurd, were it not for the fact that a majority of my Brethren think otherwise. The fact that he has lived in Minnesota for twenty four years makes against him, instead of in his favor, as it shows gross and culpable indifference to matters which are most intimately connected with the political duties he desires to perform. In my judgment the application should have been denied, without prejudice to the right to renew the same.

As said by Judge Dallas: "The conclusion seems to be inevitable that the court ought not to admit any alien to citizenship without being satisfied that he has at least some general comprehension of what the constitution is, and of the principles which it affirms." In re Bo-

dek (C. C.) 63 Fed. 813. "No person will be naturalized who has not a general familiarity with the federal constitution and with our method of government, state and national. The act of congress requires each applicant to take an oath that he is attached to the principles of the constitution. No applicant will be permitted to so swear unless he knows what those principles are." In re Naturalization, 5 Pa. Dist. 597.

I am not in favor of imposing any harsh restrictions upon, or requiring any technical knowledge of the constitution from, applicants for citizenship who are otherwise qualified. But the act of congress requires that it shall be made to appear that the petitioner is "attached to the principles of the constitution of the United States and well disposed to the good order and happiness of the same," and I cannot see how a person who is so ignorant as is this man of common matters relating to the government can be said to be attached to the principles upon which the government is founded. The correct rule is stated in the recent case of In re Meakin (D. C.) 164 Fed. 334, as follows: "While it may not be impossible for one to be attached to the principles of the constitution of the United States who is without definite knowledge of the workings of the government in detail, he must have sufficient general information concerning it to enable him to give a reason for his faith; and where, as in this case, an applicant does not know how the laws are made, who makes them, nor how they are enforced, he is illy prepared to participate in the selection of the persons who shall perform those duties." As said by the supreme court of Utah: "No one should be admitted who has not sufficient intelligence to understand the principles of the government which may rest in part on his will." In re Kanaka Nian, 6 Utah, 259, 21 Pac. 993, 4 L. R. A. 726.

In view of the fact that the evidence on matters which I consider important is not alluded to in the opinion of the court, I transcribe the portion of the record referring thereto:

"Q. Do you know what polygamy is? A. No; I don't understand. Q. Well, that means marrying more than one at the same time. A. No. Q. You don't believe in anything of that kind? A. No. Q. Do you understand what it means to become a citizen of the United States? A. Yes. Q. What does it mean? A. Well, I get all the papers. Q. You know what kind of a government we have in this country? Is this a republic or a monarchy? A. A republic. Q. Who is the President

of the United States? You don't know? A. No. Q. Where is the capital of the United States? Where are the laws made of the country? A. I couldn't tell. Q. How many years did you say you had lived in this country? Twenty five years? A. I have been in the country twenty four years. Q. Who is the Governor of the state of Minnesota? A. I don't know. Q. Where are the laws of the state of Minnesota made? Who makes the laws of the state of Minnesota? Do you know what it means to take the oath of allegiance to this country? A. No; I don't. Q. You don't know what that means? A. No; I don't. Q. Did you ever hear of the constitution of the United States? A. Yes, I heard of that. Q. Do you understand what it is? A. I don't. I ain't so much along— Q. I don't expect you to know all about it; but do you know what it is for? What it is? A. No; I couldn't explain that for you. Q. Well, if you took the oath to support the constitution of the United States, would you know what it meant? A. No; I guess— Q. You wouldn't know that?

"Mr. Sweet: We object to this applicant, on the ground that he cannot intelligently take an oath to support the government."

Examination by the court:

"Q. Don't you know who the President of the United States is? A. The President? Q. Yes; the President. A. Well, I heard it, and I know it; but I forgot his name. Q. Well, is it George Washington or Theodore Roosevelt? A. Well, they been both of them, ain't they? Q. Well, who is President now? A. Ain't it George Washington? Q. George Washington President now? A. I think. Q. No; George Washington has been dead over a hundred years. A. Well, then, it is Roosevelt. Q. Don't you know who the Governor of Minnesota is? A. Well, I heard that. I never been interested. I don't know. Q. You don't know who the Governor of the state is? A. I ain't get him. I don't remember his name. Q. Don't you know what the capital of the state of Minnesota is? A. Is it Washington? Q. Is Washington in the state of Minnesota? A. No; I guess it ain't. Q. Well, then, what is the capital of the state of Minnesota? Is it Minneapolis or Duluth or St. Paul? Or isn't it any of those places? A. It is Duluth probably. Oh, I don't know. It is Minneapolis probably. * * * Q. You think the capital of the state is either Duluth or Minneapolis? A. Yes; I couldn't say for sure which one of them. Q. Did you ever

vote? A. I couldn't, unless I had my papers. I voted as long as the first papers was good enough. Q. You have lived here in this country twenty four years? A. Yes. Q. You say that you have heard of the constitution of the United States? A. Yes. Q. What is that? A. That I can't— I couldn't— Q. What is it about? Do you know where the laws of Minnesota are enacted? Where they are passed? Where they are made? Where do they make the laws that govern this state? A. No; I don't know. Q. Do you know who it is that makes the laws? Who is it that helps to make the laws? Do you know? A. I guess the Governor. Q. The Governor? A. Yes; don't he? Q. You don't know who the Governor is? A. No; not— Q. Did you ever read about it in that paper, the Heron Lake News? A. No. Q. Now, as a matter of fact, do you read that paper any yourself? A. Well, I read it. I never read any about that. * * * Q. Do you own a farm? A. No; I rent a farm. Q. You are married? A. Yes. Q. How many children have you got? A. Four. Q. They go to school? A. Yes. Q. How old are they? A. The oldest one is four-teen. Q. How old is the youngest? A. The youngest is three. Q. Do they go to school all the time? A. Yes. Q. You live on a rented farm? A. Yes, sir.

"The Court: Well, that is all for the present.

"Mr. Knox: Your honor, I don't wish to interfere; but from what I know of this man—he is an old resident up there—I think the man is somewhat rattled. I think if your honor will examine some of his witnesses, his neighbors up there, he will get a more satisfactory result. I don't think he is so dull as he appears."

Examination by the court:

"Q. Do you know who I am? A. Yes. Q. What is my name? A. Well, your first name I don't know, but I know what your business is. Q. What is my last name? A. Well, you are the one what we have to decide cases before, Judge Quinn. Q. Yes; well, you don't need to feel annoyed here. We want to examine you to find out how well qualified you are to receive these papers. Now don't you know who the President of the United States is at the present time? Don't you know who the President of the United States is? Now, think about it. Suppose one of your children should come to you today and ask you who the President of the United States was, couldn't you tell them?

A. No; I don't think I would know for sure. Q. Well, couldn't you tell them who the Governor was? Couldn't you tell who was the Governor of Minnesota now? Couldn't you tell one of your children, if they came and asked you today, who the Governor of this state was now? A. I could tell them it was Roosevelt. Q. No; Roosevelt isn't Governor. Roosevelt is President of the United States. Now, who is Governor of the state of Minnesota? A. No; I couldn't. Of course I never read anything about it. I never asked anybody about it."

Comment seems unnecessary.